## Case No. 2,371.

### CAMPBELL et al. v. The UNCLE SAM.

[Hoff. Op. 429.]

District Court, N. D. California. Aug. 21, 1856.[1]

SEAMEN—VOYAGE BROKEN UP — DISCHARGE—EXTRA WAGES—REMISSION.

[1. A navigation company operating a line of vessels engaged in transportation between New York and San Francisco, via Nicaragua, on account of trouble in Nicaragua, sent out orders from New York for vessels sailing from San Francisco to proceed to Panama, and vessels sailing after such orders, but before they could be communicated to them, were intercepted in route, and proceeded to Panama, where they lay on waiting orders, under directions to discharge their crews. Held, that the company was liable for breach of a contract of shipment made for a voyage from San Francisco to San Juan and return, and that the seamen were entitled to their discharge and extra wages, under the act of congress.]

[2. The consul alone has power to remit the extra wages allowed seamen on discharge ordered by him in foreign port, where voyage is voluntarily broken up.]

[In admiralty. Libel in rem by Campbell and others against the steamship Uncle Sam to recover extra seamen's wages.]

Glassell & Leigh, for libellants.
Crockett & Paige, for claimant.

HOFFMAN, District Judge. This was a libel by seamen for wages, earned on board the above vessel, and for two months' extra wages, under the acts of congress. The men were discharged by the American consul at Panama. His certificate is produced showing this fact, and that he had required the payment of the extra allowance by the master. The facts of the case are as follows:

The vessel libelled belongs to a line of vessels engaged in transportation of passengers from this port to New York, via Nicaragua. About the 18th or 19th of February, 1855, the then government of Nicaragua seized all the property of the company on the isthmus, under the allegation that they were indebted to the republic of Nicaragua. The necessary effect of this seizure would have been to break up the communication between the oceans, and deprive the company of the means of forwarding either passengers or freight. Mr. William R. Garrison, son of the

---

[1] [Affirmed in Case No. 2,372.]

company's agent, at this port, who was on the isthmus at the time of the seizure, made an arrangement by which the possession and the use of their property was restored to the company until some permanent settlement of the dispute could be effected. Mr. Garrison duly apprised the company in New York of the seizure, and the arrangements he had made, and he returned to San Francisco fully persuaded that the operations of the line would not be interrupted. The steamer Cortes was accordingly despatched, on his return to this port, under the usual contracts with seamen and passengers. The Uncle Sam was the next steamer in turn, and she, too, was despatched for San Juan as usual. These vessels therefore sailed, and the seamen were shipped under a full knowledge of the facts on the part of the agents at this port. The company, on receiving the news forwarded by Mr. Garrison, saw fit to adopt a different line of conduct from that pursued by their agents here. They immediately withdrew their steamers on the Atlantic, and broke up the communication across the isthmus of Nicaragua; at the same time despatching an agent to intercept their steamers on their way to San Juan, and to order them to Panama, from which port the passengers were to be conveyed to New York by railroad and steamer from Aspinwall. The Cortes was accordingly met, when returning to San Juan, by Mr. Cross, the agent of the company, and, in conformity with the orders communicated by him, proceeded to Panama. Had she landed her passengers, and had the steamers not been withdrawn on the Atlantic side, the transportation of the passengers to New York could, under the arrangement made by Mr. Garrison, have been effected as usual. The Uncle Sam, which had, as previously stated, started for San Juan, was also met by the agent, who continued his voyage to San Francisco on board the Golden Gate. The Uncle Sam, when boarded, was but a few days out of this port, and, in conformity with the orders of the owners, she at once directed her course to Panama.

Much testimony was taken to show the condition of affairs on the isthmus of Nicaragua at the time the passengers would have arrived had she continued her voyage to San Juan. It cannot be doubted that the invasion of the Costa Ricans, and the general disorder and distraction of the country, would have prevented the passengers from crossing over if the steamers had not been withdrawn on the Atlantic side. But this point I consider immaterial, for these facts were not known to the masters who obeyed, or the owners who gave, positive instruction that the vessel should go to Panama. Whatever occurred on the isthmus occurred after those orders were given, and after the withdrawal of the Atlantic steamers rendered it necessary that their steamers on this side should go to Panama. An accidental combination of circumstances which, though it rendered the course adopted the most advantageous, was unknown to them, could not have affected their conduct, and cannot now be urged in justification of the breach of any contract for which they would otherwise be liable. It is said, however, that Mr. Cross communicated to the master of the Uncle Sam the fact that an invasion of the Costa Ricans was probable, and that the communication might thereby be intercepted; and that this intelligence, communicated after the sailing of the ship, in part, influenced the master in his determination. But the master himself admits that his orders to go to Panama were positive, and that he would have obeyed them independently of other considerations; and the letter of instructions handed him by Mr. Cross shows on its face that the company had determined to suspend the operations of their line, and had actually withdrawn their steamers on the Atlantic side, in consequence of the seizure by the Nicaraguan government, and for no other reason. The fact, too, that the Cortes proceeded to Panama, although she had actually entered the harbor of San Juan, and though nothing prevented her passengers from crossing (as stated by Mr. Garrison), shows beyond dispute that the reason of the deviation was the positive orders of the owners. What, then, was the effect of such a change of voyage upon the seamen's contract? The company, contracting through their agent here, had entered into an agreement for a voyage to San Juan and back. The company at New York had issued orders rendering the fulfillment of the contract made by their agent here impossible. The agents at either end of the line had, with full knowledge of the facts, made arrangements inconsistent with each other. If, then, by their action at New York, the company incapacitated themselves from performing the contracts made by their duly-authorized agents here, they must be liable for the breach. The case is not that of a deviation rendered necessary by fortuitous and unlooked for obstructions to the voyage. All the facts were known to Mr. Garrison here, as well as to the company in New York. The former, not perceiving any necessity for suspending the operations of the line, contracts with the men for the usual voyage, and of course bound the company by his contract. The latter, ignorant or indifferent what contracts had been entered into by their agent, adopt measures which render the breach of those contracts probable or inevitable. It seems to me that for such breaches they must be liable, and that they must have contemplated such a liability when they gave orders which exposed them to it.

Whether it acts by its agents here or at New York, it is still the company that contracts and the company that is liable. To excuse them on the ground that the agents there rendered the fulfillment of the contracts entered into by their agent here impracticable, is to allege their own nonperformance of their contract as justification

of its breach. I am unable to perceive any reason why the contracts of those who dispatched the Cortes and Uncle Sam from this port did not in all respects bind the company, notwithstanding that the managers of the company in New York came to the resolution that such contracts if entered into should not be fulfilled. If, then, the causes of the deviation, as they appear in proof, are not such as would protect the company from liability to freights or passengers for the breach of engagements with them, ought the rights of the seamen to be governed by a different rule? His engagement was to go to San Juan and back; by the order of the company, he is carried to a different and more remote port. The change in the voyage was not made in consequence of any accidental or unforeseen obstacles to its prosecution, but in obedience to the orders of the company, with whom he contracted, and in consequence of events which occurred long before he was shipped. If the convenience of the interests of the company induced them to make a change in the voyage, for causes which did not fortuitously arise in the course of it, but existed before it commenced, I am unable to see on what principle the seaman can be held to a service essentially different from that which he contracted to render.

But supposing this view to be erroneous, and that the mere fact of going to Panama, instead of San Juan, did not of itself entitle the seamen to their discharge, if the vessel had been about to pursue her voyage without delay or change, except the substitution of one port for another; yet the facts in this case abundantly show that the original voyage was broken up, and the contract with the seamen dissolved. The orders of the company to the master of the Uncle Sam were conveyed in a letter dated New York, March 17, 1856. The Uncle Sam had left San Francisco on the 5th April. The letter orders the master to proceed directly, and with all possible dispatch, to Panama, from which place the passengers would be forwarded to their destination. "This order," it further states, "has been rendered necessary in consequence of the high-handed course taken by those claiming to be the government of Nicaragua, whose acts have induced the company to withdraw their ships from the Nicaragua route." After giving directions to the master to leave San Juan at once, if the order should find him at that place, with such property of the company as he could obtain possession of, the letters of instructions are as follows: "After discharging at Panama, you will hold your ship subject to further orders from this office. You will discharge all your crew, except your officers and engineer, and put your ship on the least possible expensive footing." A second letter of instructions was received by the master at Panama. It is dated New York, April 5th, and contains the following

orders: "On your arrival at Panama, you will please dismiss as many of your crew as you can, and await orders from here. Have your ship coaled up at short notice for sea, except crew." Notwithstanding these orders, the captain did not discharge his crew, but retained them on board, expecting further orders. The men seem to have remained without complaint, some thirty days after the arrival of the ship at Panama. They then applied to the consul for relief, and the master was cited to appear before him. He had previously noted a protest before the consul, shown him the letter of the owners first above referred to, and explained his reasons for coming to Panama. The consul having declined to accede to the somewhat unreasonable demand of the master, that the case should be investigated on that day, (Sunday,) postponed the examination until the following Tuesday. On Tuesday he was again attended by the master, and after investigating the case so far as he thought necessary, announced his determination to discharge the men and allow them two months' extra pay.

It appears to me that the men were clearly entitled to their discharge. They had been brought to a port other than that for which they had shipped, and instead of returning at once to San Francisco, they had been detained already thirty days, and for aught that appeared, the detention of the ship might have been indefinitely protracted. The company had announced that they had withdrawn their ships from the route, and had given positive instructions to the master to discharge his crew, and await further orders. What those orders would be, evidently depended on circumstances impossible to be foreseen. The ship might have been directed to return to San Juan, or go to any port to which her owners might direct her. Both the period of her detention and her subsequent destination were wholly uncertain. One fact was clear, that the original voyage for which the men had shipped had been broken up and abandoned. The voyage usually occupied less than a month, the detention at San Juan not ordinarily being more than a week. The men were not discharged by the consul at Panama until the 24th May, having left San Francisco on the 5th April.

It is urged by the advocate of the claimants that the master was entitled to remain at Panama a reasonable time before the voyage could be treated as abandoned and the contract with the crew dissolved. In order to show that the delay was not in this case unreasonable, he adverts in the brief submitted to the court the following considerations: "That the entire business of the company was deranged by the sudden seizure of their boats by the Walker government; that war had broken out with Costa Rica, and it was not certain which party would prove victorious; that in this state of affairs it was impossible for the company to negotiate even

with Walker; that in the sudden breaking up of so mighty an enterprise, it was impossible to decide without some delay what should be done with the ships; that the business was conducted between such distant points that some delay was unavoidable." If these considerations are suggested to prove that it was impracticable for the company to have acted otherwise than they did, they have certainly great force. But they are precisely the reasons, it seems to me, to prove the voyage to have been necessarily broken up and abandoned. No blame can of course be imputed to the company for being placed in so embarrassing a position. But surely the seamen, who had been shipped for a voyage to San Juan and back, were not required to wait in Panama until the company should decide what should be done with their ships, or until the termination of the war enabled them to renew negotiations with Nicaragua. Where the seaman claims his discharge on the ground that the voyage had been abandoned, and the only evidence of the abandonment is that a delay or detention has occurred in the course of it, the delay or detention to produce such a result should appear to be unreasonable. But when the port of destination has been changed, and the orders to the master direct him to discharge his crew, when, from all the circumstances, it is apparent that the original voyage has been wholly abandoned by the owners, the crew are entitled to be at once discharged. But even on the supposition that they were required to wait a reasonable time, they surely had done so in the present case. The Cortes, which had arrived two weeks before them, still lay at Panama, nor had her voyage been resumed. The very circumstances alluded to in the brief of the advocate for the claimants must have apprised the consul that the detention at Panama might be indefinitely protracted, and justified him in considering that the crew were at once entitled to their discharge. Such seems in fact to have been the opinion of the master, for he expressly states that he offered to discharge the men and pay their wages to San Francisco. This he would hardly have done had he considered himself entitled to their further services. With regard to the charge of fraud on the part of the consul, it is enough to say that in my judgment the men were entitled to their discharge; and the allegation that, in doing what by law he was bound to do, he was animated by improper motives, is unreasonable in itself, and unsupported by proof.

It may be observed in conclusion, that it clearly appears from the evidence that the real cause of the master's dissatisfaction was not the discharge of the men, but the allowance of the extra wages. This allowance the consul alone has by law power to remit. As the men had a right to their discharge, and as the consul has not remitted the extra allowance, they are entitled to recover it in this court.

[NOTE. For affirmation on appeal to the circuit court, see Case No. 2,372, next following.]